IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHAWN ROBINSON, ex. rel., M.R., a minor, | ) | |
| | ) | |
| Plaintiff, | ) | No.  10 CV 4056 |
| | ) | |
| v. | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Shawn Robinson ("plaintiff" or "Ms. Robinson"), has filed a motion for summary judgment [26] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), pursuant to 42 U.S.C. § 1383(c)(3).  Ms. Robinson pursues disability benefits on behalf of her minor child, M.R. ("M.R."), under Title XVI of the Social Security Act.  For the reasons set forth below, plaintiff's motion for summary judgment [26] is granted in part and denied in part, and the case is remanded for further proceedings consistent with this opinion.

**I.    PROCEDURAL HISTORY**

Ms. Robinson filed an application for supplemental security income ("SSI") on behalf of M.R. on October 23, 2007, based on M.R. having Attention Deficit Hyperactivity Disorder ("ADHD").  (R. 95-97.)  That application alleged a disability onset date of February 1, 2001, and was denied initially and upon reconsideration.  (R. 95, 59-62, 64-68.)  In response to those denials, Ms. Robinson sought a hearing, at which she

1

and M.R. appeared without counsel and testified on June 3, 2009.  (R. 78-80, 8-43.)  On June 19, 2009, Administrate Law Judge ("ALJ") Steven Templin issued a decision denying benefits.  (R. 49-58.)  The Appeals Council denied Ms. Robinson's request for review of that decision (R. 3-5), and Ms. Robinson filed a timely appeal to this Court.  The parties have consented to our jurisdiction pursuant to 28 U.S.C. § 636(c) [12].

## II.    FACTUAL BACKGROUND

M.R. was born on December 2, 2000.  (R. 45.)  While she has been treated for asthma and asthma-related symptoms in the past, M.R.'s ADHD is the "primary diagnosis" that forms the basis of her current SSI application.[1]  (*Id.*)

### A.    Medical and Other History

According to records from Provena St. Joseph Hospital, on the morning of May 24, 2007, M.R. became very upset and agitated, held a fork to her throat, and told her grandmother Geraldine Robinson that she wanted to kill herself.  (R. 195, 206.)  Geraldine Robinson then took M.R. to Provena St. Joseph's emergency room.  (*Id.*)  While there, an emergency department physician and a social worker completed a Behavioral Health Intake Assessment questionnaire.  (R. 206-10.)  That assessment states that M.R. had expressed suicidal thoughts, and had a specific organized plan, but otherwise showed a "low" "level of dangerousness."  (R. 206, 208.)  According to that assessment, M.R. admitted that on two other occasions, she had "held a sharp knife

---

[1] In his opinion, the ALJ noted that while Ms. Robinson has alleged disability in the past due to physical ailments such as asthma, "the focus on this claim has been the impact of the combination of mental disorders upon the claimant's behavior and academic performance."  (R. 53.)  Plaintiff does not dispute that conclusion before this Court, and as a result, our opinion does not address any such physical ailments or their impact on M.R.'s claim.

and threatened to stab herself," and "took a belt and put it around her neck though she denies that she was trying to choke herself." (R. 206.) The assessment also noted that M.R. had unpredictable behavior and was disruptive. (*Id.*) M.R. was diagnosed with "depressive disorder nos" and was released from the hospital that same day. (R. 210.)

On July 11, 2007, Rena Goodfriend-Leve, M.D., of Streamwood Behavioral Health System, saw M.R. for the first time and completed an outpatient psychiatric evaluation of her. (R. 347-49.) Dr. Goodfriend-Leve diagnosed M.R. with ADHD, "Combined Type Oppositional Defiant Disorder, "Dysthymic Disorder," and "R/O Mood Disorder, NOS." (R. 348.) Dr. Goodfriend-Leve noted that M.R. "disrupts in the class room" and "doesn't get her work done," and that at home she is "oppositional." (R. 347.) Dr. Goodfriend-Leve also noted what appear to have been two instances in which M.R. reported she wanted to or was going to kill herself:

> A few weeks ago she said she wanted to kill herself because she was fat. She picked up a knife and ran out of the house. She said she did this because she was angry, and she feels that she can't control her anger. One time when mother was at work and grandmother was alone with her trying to get her ready for school, she ran out of the house and said she was going to run away. The grandmother called the police, and she said she was going to kill herself. SASS was involved.

(*Id.*) Dr. Leve-Goodfriend wrote that "[c]urrently, there is no suicidal or homicidal ideation." (*Id.*) She directed M.R. to begin a trial of Trileptal and to "continue her ongoing therapy with Jeanette."[2] (R. 348-49.) Dr. Goodfriend-Leve continued to meet

---

[2] Dr. Goodfriend-Leve's notes refer to M.R. having therapy sessions with Jeanette and Gina. (*E.g.*, 438-39, 431.) Ms. Robinson, M.R., and Kelly Besler of Streamwood Behavioral Health Systems also refer to such sessions. (R. 123, 36, 425.) The record does not contain any treatment notes or other documents originating with those individuals, so as a result, we do not know over what time period, or how frequently, M.R. received such therapy. However, we note that defendant does not dispute that M.R. had therapy in an effort to manage her condition.

with M.R. roughly every one to three months between July 2007 and April 20, 2009, monitoring M.R.'s medication and overall progress.  (*E.g.*, R. 421-23, 431-39.)

Throughout the relevant time period, Ms. Robinson and M.R.'s grandmother completed various reports for submission to the Social Security Administration's Bureau of Disability Determination Services ("DDS").  In a report dated November 16, 2007, Ms. Robinson noted, among other things, that M.R. had a "real bad problem" with concentrating, "can't sit still longer than 5 minutes," and "when she gets angry she smacks, bite, scream at herself [sic]."  (R. 120, 122.)  In response to the question "Control his/her own behavior and avoid unsafe behaviors?," Ms. Robinson answered "no."  (R. 122.)

On November 25, 2007, M.R.'s Principal, Cheryl DeRoo, completed a report to DDS in which she wrote, among other things, that "M.R.'s inability to stay focused and on task has caused her to fall behind her peers in both academic and social skills."  (R. 125.)  Ms. DeRoo also indicated that M.R. was receiving regular education with no special instruction, that she was reading at a kindergarten level, and that her math and written language levels were "early 1st grade."  (R. 124.)

On November 26, 2007, Janet Heim, M.R.'s first grade teacher, completed a Teacher Questionnaire for DDS.  (R. 360-67.)  At the time she completed it, Ms. Heim had known M.R. for 62 school days and spent six hours a day with her.  (R. 360.)  Ms. Heim rated M.R.'s performance in the six domains of functioning relevant to childhood disability determinations, on a scale of one to five, one being "no problem," two being "a slight problem," three being "an obvious problem," four "a serious problem," and five "a very serious problem."  (R. 361-66.)  In the domain of Acquiring and Using Information,

which consisted of ten performance categories, Ms. Heim found that M.R. had  a

"serious problem" in three categories;  an "obvious problem" in five categories; and a

"slight problem" in two categories.  (R. 361.)  In the domain of Attending and Completing

Tasks, consisting of thirteen performance categories, Ms. Heim found that M.R. had a

"serious problem," on an hourly or daily basis, in four categories; an "obvious problem,"

on an hourly or daily basis, in five categories; and a "slight problem," on a daily or

weekly basis, in four categories.  (R. 362.)  In the Interacting and Relating with Others

domain, consisting of thirteen categories, Ms. Heim found that M.R. had "an obvious

problem," on a weekly basis, in the category of "making and keeping friends"; a "slight

problem," on a daily or weekly basis, in seven categories; and "no problem," on a daily

or weekly basis, in four categories.[3]  (R. 363.)

Ms. Heim reported that she did not observe any problems with M.R.'s functioning

in the Moving and Manipulating Objects domain.  (R. 364.)  In the domain of Caring for

Himself or Herself, consisting of ten categories, Ms. Heim found that M.R. had a "slight

problem," occurring on a weekly basis, in four categories," and no problem" in six

categories.  (R. 365.)  In the Health and Physical Well-Being domain, Ms. Heim wrote

that M.R. had a "significant problem with inattention especially when not on [her ADHD]

medication," and that "her ability to focus and attend does improve with medication

[sic]."  (R. 366.)  According to Ms. Heim, when M.R. was without her ADHD medication

at one point in the school year for eleven school days, this had "a significant impact on

---

[3]  It appears that Ms. Heim overlooked or chose not to rank M.R. in the category of "Taking
turns in a conversation" for this domain.  (R. 363).  As a result, the rankings listed above for this
domain add up to only twelve.

her day and ability to learn." (*Id.*)

On January 28, 2008, William N. Hilger, Ph.D., conducted a psychological examination of M.R. at the request of DDS. (R. 368-71.) Dr. Hilger noted that M.R. applied for "Social Security disability benefits due allegedly to a history of asthma, ADHD, anger problems and attempted suicide." (R. 368.) Dr. Hilger apparently reviewed M.R.'s May 2007 hospital records, along with Ms. Heim's November 2007 report. (*Id.*) Dr. Hilger observed that M.R. appeared "mildly restless," but "was adequately attentive and cooperative in the evaluation" and spoke in a "fluent articulate manner." (*Id.*) He also noted that Ms. Robinson had not given M.R. her "anti-hyperactive" medication that morning, so he had her give M.R. the medication in his presence. (*Id.*) Under "Psychiatric Treatment," Dr. Hilger noted that M.R. had been seeing Dr. Goodfriend-Leve "since August 21, 2007 and is taking medications," and is seeing a therapist once a week at Streamwood Behavioral Health Center. (R. 369.) He wrote that M.R. has never had a psychiatric hospitalization, "except she was taken to the emergency room in September 2007 when she did not want to go to school or get dressed and was threatening to runaway and put a knife to her neck and threatened to kill herself [sic]."[4] (*Id.*)

In the "Mental Status" section of his report, Dr. Hilger characterized M.R. as "generally a happy girl," and wrote that "[s]he has not made any definite suicide attempts." (R. 369.) In the "Conclusion" section, Dr. Hilger noted again that M.R. "had

_____

[4] The record before us, including the parties' briefs, does not contain any documents referencing an emergency room visit in *September* 2007. As a result, we assume that the September reference by Dr. Hilger was an inadvertent error, and in fact he was referring to M.R.'s emergency room visit in May 2007, referenced earlier in his report. (R. 368.)

an episode in September 2007 when being cared for by her grandmother when she did not want to go to school" and "threatened suicide at the time, but did not actually carry it out." (R. 370.) He again referenced her treatment with Dr. Goodfriend-Leve, as well as the teacher reports indicating the prescribed Adderall "does seem to be helping her," but also that "her performance in school was much worse" when she did not take that medication for eleven days. (R. 370-71.) Dr. Hilger diagnosed M.R. with "ADHD inattentive type, fairly controlled with medication; adjustment reaction of childhood with depression, fairly controlled with medication and counseling [sic]." (R. 371.) In his final remarks, he wrote M.R. "shows average mental potential, if she continues taking her medication and counseling, to perform age appropriate activities," and that "she also need appropriate discipline, structure, encouragement and setting of limits [sic]." (*Id.*)

In February 2008, Julio Pardo, M.D., and John Tomassetti, Ph.D., reviewed some of M.R.'s medical and other records at the request of DDS, and completed a Childhood Disability Evaluation Form of M.R.'s level of functioning in the six applicable domains. (R. 374-79.) They noted "impairments" of "asthma, ADHD, anger problems and attempted suicide." (R. 374.) Those doctors found that M.R. had a marked limitation in the domain of Health and Physical Well-Being; less than marked limitations in the domains of Acquiring and Using Information, Attending and Completing Tasks, Interacting and Relating With Others, and Caring for Yourself; and no limitation in the domain of Moving About and Manipulating Objects. (R. 376-77.)

In their comments on M.R.'s marked limitation in the Health and Physical Well-Being domain, Drs. Pardo and Tomassetti noted Dr. Hilger's diagnosis of ADHD inattentive type "fairly controlled with medications," that a teacher's questionnaire

7

indicates M.R. "has significant difficulty with inattention especially when not on medication but that her ability to focus does improve with medication," and that Ms. Robinson indicates M.R. attends counseling once a week for ADHD and anger problems.  (*Id.*)  In their comments on M.R.'s less than marked limitation in the Caring for Yourself domain, they wrote "Child threatened to kill herself because she was fat, she picked up a knife and ran out of house …. But she is aware of dangers that might present themselves and knows to avoid dangerous situations."  (R. 377.)  They ultimately concluded that M.R.'s impairments did not functionally equal a Listing and thus she "must be considered not disabled."  (R. 379.)

On March 27, 2008, Dr. Goodfriend-Leve wrote that M.R. is "doing better" and is "concentrating better" since her Adderall dosage was modified.  (R. 434.)

In a May 26, 2008 Childhood Function Report completed by Ms. Robinson, she reported that M.R. "bites and hits herself.  She has a horrible time paying attention …. She gets angry and uses socks to choke herself or any other object.  She threatens to run away.  When I correct her she tries to hit me during the time I correct her."  (R. 143.)

On June 11, 2008, Dr. Goodfriend-Leve reported M.R. "has many mood swings, but mother says they seem to be getting better and are more controlled [sic]."  (R. 433.)

In an undated report completed by M.R.'s grandmother, she wrote that on June 16, 2008, M.R. "try to kill herself and tie a sock around her neck [sic]."  (R. 130.)

In July 2008, Cosme Cagas, M.D., and Kirk Boyenga, Ph.D., reviewed some of M.R.'s medical and other records at DDS' request, and completed another Childhood Disability Evaluation of M.R.'s level of functioning in the six pertinent domains.  (R. 405-10.)  Like Drs. Pardo and Tomassetti, they also found M.R. had no limitation in the

Moving About and Manipulating Objects domain, and less than marked limitations in the Acquiring and Using Information, Attending and Completing Tasks, and Interacting and Relating With Others domains.  (R. 407-08.)  However, in the Caring for Yourself domain, Drs. Cagas and Boyenga found M.R. had a marked limitation (in contrast, Drs. Pardo and Tomassetti had found a less than marked limitation there), and in the Health and Physical Well-Being domain, Drs. Cagas and Boyenga found M.R. had a less than marked limitation (Drs. Pardo and Tomassetti had found a marked limitation).  (R. 408.)

In their comments on the Caring for Yourself domain, Drs. Cagas and Boyenga wrote "Threatened to kill self because of being fat, picked a knife and ran out of house. Again attempted to kill herseld thes secomd time by tying a sock around her neck (info from mother in Disab Rep-Appeals).  Needs reminders to clean self on a regular basis [sic]."  (R. 408.)  They concluded M.R.'s "impairment or combination of impairments is severe, but does not meet, medically equal, or functionally equal the Listings."  (R. 405.)

On September 8, 2008, October 15, 2008, and October 22, 2008, Ms. Robinson called the local police station for assistance, based on M.R. being "out of control" and refusing to cooperate.  (R. 416-20.)  As reported to the responding officers, M.R.'s behaviors included "throwing items in her room," refusing to get out of a car, and refusing to go to school.  (*Id.*)

On October 20, 2008, Dr. Goodfriend-Leve noted that the prior Saturday night, Ms. Robinson called the police because M.R. refused to take her Trileptal, locked herself in a room, and was throwing things.  (R. 431.)  The doctor also noted that M.R. was not currently in therapy and it would "be of benefit for her to return to therapy with Gina to talk about her feelings about her mother and sister being pregnant."  (*Id.*)

On November 16, 2008, M.R. apparently kicked and hit her mother and sister. (R. 424.)  In response, Ms. Robinson took M.R. to a Streamwood Behavioral Health Systems facility, where Kelly Besler, M.S., met with M.R.  (R. 424-30.)  In her "Integrated Assessment" report, Ms. Besler noted that M.R. reported "she put a knife to her neck, tried to cut herself and kill self [sic]."  (R. 427.)  Ms. Besler described M.R. as "depressed," and they both signed a "safety contract" wherein M.R. promised "I will not hurt myself or anyone else."  (R. 429, 430.)

At their April 20, 2009 meeting, Dr. Goodfriend-Leve prescribed Zoloft because M.R. was "more depressed," "less motivated," and "seemed downtrodden."  (R. 422.) The doctor modified M.R.'s medication and also noted that she is to "restart individual therapy with Jeanette."  (*Id.*)

On May 28, 2009, Charlotte Janura, M.R.'s second grade teacher, wrote a letter regarding M.R.'s functioning.  (R. 174.)  She stated that although M.R. is currently taking medication for ADHD, anger management, and depression, "[h]er inability to stay focused and on task has caused her to be behind academically and socially in the classroom and with her peers."  (*Id.*)  Ms. Janura wrote that M.R. was functioning on a first grade level (a grade level behind the rest of the class), and that she would be attending summer school.  (*Id.*)  She indicated that the school's social worker had been meeting with M.R. and "focusing on peer/social relationships," and that M.R. was seeing the school psychologist "in a small group focusing on academic interventions."  (*Id.*) Finally, Ms. Janura noted that, "[c]learly, even with all the extra help, [M.R.] is a child that is working below grade level due to issues that are impacting her learning."  (*Id.*)

In another undated report to DDS, Ms. Robinson wrote that on September 1,

2009, there had been a change in M.R.'s condition, specifically: "Trying to run away. Doesn't want to go to school. Oputting belts around her neck mostly inflicting pain on herself [sic]." (R. 148.) Ms. Robinson also wrote M.R. "gets frustrated then begans to self inflict herself, she tries to runaway, wrap belts around her neck and states she will kill herself [sic]." (R. 152.)

### B.      M.R.'s Hearing Testimony

At the June 3, 2009 hearing before the ALJ, M.R. testified that she did not like school and did not do well there. (R. 32, 34.) She appeared to be twitching and moving around during her testimony, and stated that while that was normal for her, it affected her schoolwork. (R. 33-34.) She admitted doing mean things to her mother and grandmother, such as biting them. (R. 35-36.) She stated it was easy for her to talk to Ms. Jeanette, and that she liked Dr. Goodfriend-Leve. (R. 36.) When the ALJ asked, "Now that you're taking all these pills, are you feeling better than you felt before?," M.R. responded "Not really," but elaborated that "just one of the pills," "for stress," makes her feel better, and she does not notice a difference with the others. (R. 36-37.)

### C.      Ms. Robinson's Hearing Testimony

Ms. Robinson also testified before the ALJ. (R. 10-37.) Ms. Robinson stated that M.R. took medication for ADHD, depression, as well as sleep and anger control issues. (R. 13-15, 23.) She noted M.R.'s teachers had expressed concern because M.R. was "zoning off" or acting out while in school. (R. 17.) Ms. Robinson stated M.R. had been seeing a therapist for nearly two years, with a break when M.R. visited her father in Kentucky for the summer. (R. 17-18.) She testified that M.R. had "episodes" of trying to harm herself, including "an incident where she has put like, got a sharp piece of

mulch and put it to her neck, saying she wanted to kill herself," and other incidents

involving tying socks. (R. 23.) She also discussed a separate incident when M.R. had

acted out by kicking her mother while pregnant and throwing a Gatorade bottle at her

sister. (R. 23-24.) Ms. Robinson testified that M.R. was a year behind in school and as

a result was currently enrolled in summer school. (R. 21.)

## III.   LEGAL STANDARD

### A.   Standard of Review

As with an ALJ's decision concerning an adult, judicial review of a decision

denying SSI benefits to a child claimant is limited to determining whether the ALJ

applied the correct legal standards in reaching his or her decision, and whether there is

substantial evidence to support the relevant findings. *Schoenfeld v. Apfel*, 237 F.3d

788, 792 (7th Cir. 2001). Thus, the court must affirm the ALJ's decision if it is supported

by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v.*

*Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere

scintilla of proof." *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). It means

"evidence a reasonable person would accept as adequate to support the decision."

*Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007). In determining whether there is

substantial evidence, the Court reviews the entire record. *Kepple*, 268 F.3d at 516.

However, our review is deferential. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.

2007). We will not "reweigh evidence, resolve conflicts, decide questions of credibility,

or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336

F.3d 535, 539 (7th Cir. 2003) (citation omitted).

Nonetheless, if, after a "critical review of the evidence," the ALJ's decision "lacks

evidentiary support or an adequate discussion of the issues," this Court will not affirm it. *Lopez*, 336 F.3d at 539 (citations omitted). While the ALJ need not discuss every piece of evidence in the record, he "must build an accurate and logical bridge from the evidence to her conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Further, the ALJ "may not select and discuss only that evidence that favors his ultimate conclusion," *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995), but "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Ultimately, the ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of [his] reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (citation omitted).

**B.     Disability Determination**

M.R. is not eligible for SSI benefits unless she is disabled under the Social Security Act. A child is disabled if she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). Whether a child meets this definition is determined via a three-step inquiry. 20 C.F.R. § 416.924(a); *Murphy*, 496 F.3d at 633. First, if the child is engaged in substantial gainful activity, her claim will be denied. *Id.* Second, if she does not have a medically severe impairment or combination of impairments, her claim will be denied. *Id.* Third, the child's claim will be denied unless her impairment meets, or is medically or functionally equivalent to, one of the listings of impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). *Id*; 20 C.F.R. § 416.902.

13

To determine whether an impairment is the functional equivalent of a Listing, an ALJ must analyze its severity in six age-appropriate domains: (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3) Interacting and Relating with Others; (4) Moving About and Manipulating Objects; (5) Caring for Oneself; and (6) Health and Physical Well-Being. 20 C.F.R. § 416.926a(b)(1). Functional equivalence exists, and a child qualifies for benefits, if the ALJ finds a "marked" difficulty in two domains of functioning, or an "extreme" limitation in one. 20 C.F.R. § 416.926a(d).[5]

The evidence relevant to whether a child's limitations are marked or extreme involves both medical and nonmedical sources. 20 C.F.R. § 416.924a(b)(3). The latter may include information from parents, teachers, and other people who know the child, and their descriptions of relevant activities in school, at home, or in the community. 20 C.F.R. §§ 416.924a(b)(3), (e).

After noting that M.R. was a "school-aged child for purposes of disability evaluation" (R. 52), ALJ Templin followed the required three-step analysis. He concluded M.R. satisfied the requirements at step one because she had not engaged in substantial gainful activity "at any time material to this decision." (*Id.*) At step two, the ALJ found, relying on the conclusions of the DDS medical consultants' reports, that M.R. had "established the threshold requirement of a 'severe' impairment," specifically: "[ADHD], an affective disorder, and fits of temper; the latter of which may well be associated with [M.R.'s] depression." (R. 53.) At step three, the ALJ found that M.R.'s

_____

[5] A "marked" limitation is one that "interferes seriously" with the child's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation "interferes very seriously" with the child's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

14

impairments did not meet, or medically or functionally equal, a Listing.  (R. 53-57.)

Plaintiff asks this Court to find that the ALJ erred in his analysis.  First, Ms. Robinson argues that the ALJ committed reversible error by failing to make any credibility assessment of her testimony.  Second, Ms. Robinson asserts that the ALJ failed to properly consider the report from M.R.'s first grade teacher, Ms. Heim.  Third, Ms. Robinson contends that the ALJ erred by cursorily dismissing the opinions of the state agency physicians.  Finally, Ms. Robinson argues generally that the ALJ's determination of M.R.'s functional limitations in the six domains lacks record support. We address those issues, albeit in a different order, below.

## IV.    ANALYSIS

### A.    The ALJ Failed to Properly Consider the Reviewing Medical Consultants' Opinions.

As noted above, four DDS medical consultants, Drs. Pardo and Tomassetti, and Drs. Cagas and Boyenga, completed two assessments of M.R.'s functioning levels in the six domains relevant to an impairment's functional equivalence to a Listing.  (R. 374-79, 405-10.)  In so doing, both sets of doctors concluded that M.R. had a severe impairment or combination of impairments.  However, Drs. Pardo and Tomassetti concluded in February 2008 that M.R. had a marked limitation in the Health and Physical Well-Being domain (and less than marked or no limitations in the other domains), while Drs. Cagas and Boyenga concluded in July 2008 that M.R. had a marked limitation in the Caring for Yourself domain (and less than marked or no limitations in the other domains).  Ultimately, both sets of doctors concluded M.R.'s impairment was not functionally equivalent to a Listing.

The ALJ cited those reports alone as support for his conclusion that M.R. had a severe impairment or its equivalent. (R. 53.) He also stated that those reports "implicitly" reflect that M.R.'s disorders do not meet a Listing and that M.R. "has not experienced the [requisite] degree of dysfunction" in four of the pertinent domains. (*Id.*) However, the ALJ went on to state:

> Based upon this record in its entirety, I am not convinced by the opinions of the reviewing medical consultants to the DDS concerning the claimant's degree of dysfunction in the 6 domains pertinent to a child in the claimant's age group. I find the opinions inconsistent, and having the effect of double-weighting the impact of the claimant's ADHD.

(R. 53-54, citations omitted.) The ALJ said nothing more regarding his assessment of those reports, including his decision to reject the aspect of the January 2008 report finding M.R. had a marked limitation in the Health and Physical Well-Being domain, and the aspect of the July 2008 report finding that M.R. had a marked limitation in the Caring for Yourself domain.

In accepting some portions of the DDS medical consultants' reports, and summarily rejecting others as "inconsistent," the ALJ failed to appropriately explain the weight he gave to those reports. *See* 20 C.F.R. § 416.927(e)(2)(ii) ("Unless a treating source's opinion is given controlling weight, the [ALJ] must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant …, as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us."); Social Security Ruling ("SSR") 96-6p, 1996 WL 374180, at *1 ("Findings of fact made by State agency medical and psychological consultants ... regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources ….

16

[ALJs] … may not ignore these opinions and must explain the weight given to these opinions in their decisions.").

By "inconsistent," we assume the ALJ was referring to the fact that Drs. Cagas and Boyenga concluded M.R. had a marked limitation in the Caring for Yourself domain and a less than marked limitation in the Health and Physical Well-Being domain, while Drs. Pardo and Tomasetti reached opposite conclusions.  However, that inconsistency is not self-evidently damning, as the ALJ assumes it is, as Drs. Cagas and Boyenga completed their report five months after Drs. Pardo and Tomasetti, and M.R. had another episode related to suicide during that intervening period.  As discussed in further detail below, the ALJ made no mention of that important evidence in discussing those doctors' reports, notwithstanding the fact that such evidence might explain at least one aspect of their alleged inconsistency.  Further, the ALJ provided no explanation as to how he might accept the portions of those reports supporting one of his conclusions (that M.R. did not have a marked limitation in four domains), while at the same time rejecting each report's conclusion that M.R. had a marked limitation in another domain.  That form of cherry-picking runs afoul of, among other things, the ALJ's obligation to "confront the evidence that does not support his conclusion and explain why it was rejected."  *Indoranto*, 374 F.3d at 474.

Additionally, the ALJ's reference to the reports' alleged "double-weighting" of M.R.'s ADHD further warrants remand.  SSR 09-3p, issued four months before the ALJ's opinion here, explicitly states:

> Rating the limitations caused by a child's impairment(s) in each and every domain that is affected is not "double-weighting" of either the impairment(s) or its effects.  Rather, it recognizes the particular effects of

17

the child's impairment(s) in all domains involved in the child's limited
activities.

SSR 09-3p, 2009 WL 396025, at *4; *accord* 20 C.F.R. § 416.926a(c) ("[A]ny given

impairment may have effects in more than one domain; therefore, we will evaluate the

limitations from your impairment(s) in any affected domain(s)."); 20 C.F.R. §

416.926a(e)(2)(i) ("Your day-to-day functioning may be seriously limited when your

impairment(s) limits only one activity or when the interactive and cumulative effects of

your impairment(s) limit several activities.").  As a result, the fact that the DDS medical

consultants may have considered M.R.'s ADHD-related impairment as relevant to more

than one domain does not support the ALJ's rejection of some of their opinions.  *See*

*Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004) (noting that "an administrative

agency's decision cannot be upheld when the reasoning process employed by the

decision maker exhibits deep logical flaws, even if those flaws might be dissipated by a

fuller and more exact engagement with the facts.") (citations omitted).

Finally, in reaching his conclusions that M.R. had a less than marked limitation in

the Caring for Yourself domain, the ALJ cited no medical evidence, but relied only upon

Ms. Robinson's statements in Function Reports and Ms. Heim's school report.  (R. 56.)

In so doing, it appears the ALJ may have independently evaluated the evidence and

improperly substituted his judgment for that of a physician's.  *See, e.g., Clifford v. Apfel*,

227 F.3d 863, 870 (7th Cir. 2000) (reversing where ALJ rejected treating physician's

opinion as "inconsistent" with claimant's activities of daily living without any explanation

for that conclusion, and noting that by doing so, the ALJ failed to minimally articulate his

reasons for crediting or rejecting evidence of disability, and improperly substituted his

own judgment for a physician's opinion without relying on other medical evidence or authority in the record); *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) ("Being unable to discern how – apart from substituting his own judgment for that of the medical witnesses – the ALJ reached his determination regarding the degree of Rohan's impairments, we must reverse and remand for further proceedings.").  As a result, remand is warranted.

**B.     The ALJ Failed to Properly Analyze Ms. Robinson's Credibility.**

Because the ALJ is in a superior position to judge credibility, the ALJ's credibility determination is entitled to "special deference."  *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004) (citation omitted).  However, the ALJ is still required to articulate his reasoning and discuss or distinguish relevant contrary evidence.  *Clifford*, 227 F.3d at 870.  Additionally, the ALJ must follow the requirements of SSR 96-7p.  Among other things, SSR 96-7p provides that an ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  1996 WL 374186, at *2.

Here, the ALJ's opinion references various forms of evidence supplied by Ms. Robinson, including hearing testimony.  In many instances, the ALJ appears to have relied upon such evidence as support for his conclusions.  (*See* R. 54 - discussing Ms. Robinson's testimony and reports as related to the Attending and Completing Tasks domain; R. 56 - same as related to the Moving About and Manipulating Objects domain; R. 57 - same as related to the Health and Physical Well-Being domain.)  However,

when discussing evidence from Ms. Robinson in the context of the Interacting and Relating with Others domain, the ALJ seemed to question its persuasiveness, as he wrote: "I credit the mother's sincerity, and recognize that, as a single parent, she has had significant difficulty in serving as a full-time caregiver, without respite. This, I am convinced, colors her perception that the claimant's disorders have been so persistent and severe as to lead her to conclude that the claimant is disabled." (R. 55.) He also appears to have downplayed such evidence in his evaluation of the Moving About and Manipulating Objects and Caring for Yourself domains. (R. 54, 56.)

Unfortunately, at no point in his decision did the ALJ expressly address whether or not he found Ms. Robinson to be credible, nor did he ever explain why he apparently credited the portions of her testimony and administrative reports that supported his conclusions, and discredited those that contradicted his conclusions. Similarly, the ALJ never addressed what weight he gave the evidence supplied by Ms. Robinson. The ALJ's failures in these respects violate the applicable regulation and Seventh Circuit precedent. SSR 96-7p, 1996 WL 374186, at *4 ("The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'"); *Hopgood v. Astrue*, 578 F.3d 696, 700 (7th Cir. 2009) (remanding where the ALJ wrote claimant's mother was "generally credible," but failed to explain why he did not find some of her testimony to be persuasive or to explain the reasons for his credibility finding for the benefit of subsequent reviewers); *Giles v. Astrue*, 483 F.3d 483, 488-89 (7th Cir. 2007) ("Here, the ALJ did not make a credibility assessment as to [claimant's mother's] testimony, though

the ALJ did recite some parts of the testimony.  If [her] testimony was not credible, the

ALJ was obligated to explain the basis of that assessment.  If, on the other hand, [her]

testimony was credible, the ALJ was required to explain why the testimony did not

support a finding that Damien was markedly limited in attending and completing tasks.").

The Commissioner asks that we infer a credibility finding from the ALJ's

statement that he credited Ms. Robinson's sincerity but found her perception colored by

her status as a full-time caregiver.  We decline to do so.  Among other things, the ALJ

provides inadequate record support for his "conclusion," and his inconsistent treatment

of Ms. Robinson's testimony impairs any meaningful inference of a credibility finding.

SSR 96-7p, 1996 WL 374186, at *4; *Brindisi v. Barnhart*, 315 F.3d 783, 788 (7th Cir.

2003) (an ALJ cannot accept or reject particular statements to support his conclusion,

but must evaluate "credibility as an initial matter in order to come to a decision on the

merits.").  Further, it is improper for the Commissioner to provide a post-hoc explanation

for any purported credibility determination that was not included in the ALJ's decision

itself.  *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("regardless of the

requirements of [SSR] 96-7p, general principles of administrative law preclude the

Commissioner's lawyers from advancing grounds in support of the agency's decision

that were not given by the ALJ.").  For those reasons, the ALJ's failure to properly

analyze Ms. Robinson's credibility warrants remand.

### C.    The ALJ Failed to Properly Analyze Ms. Heim's Report.

An ALJ must "consider all relevant evidence in the case record," and this

includes opinion evidence from "other sources."  SSR 06-03p, 71 Fed. Reg. 45593-03,

at *45596.  "Other sources" include "[e]ducational personnel, such as school teachers,

counselors, early intervention team members, developmental center workers, and daycare center workers."  *Id.* at *45594.  SSR 06-03p notes "[o]ften, these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time."  *Id.* at *45595.  Additionally, SSR 06-03p provides that the ALJ "generally should explain the weight given to opinions from these 'other sources.'"  *Id.* at *45596.  The weighing factors set forth in 20 C.F.R. § 416.927 apply to such "other sources," and include the nature and extent of the relationship between the source and the individual, the source's qualifications and area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, and whether that opinion is consistent with other evidence.  *Id.* at **45595, 45596.

Here, M.R.'s first grade teacher Ms. Heim completed a lengthy report detailing her assessment of M.R.'s limitations in various domains.  (R. 360-67.)  In his opinion, the ALJ noted – and appears to have relied upon – Ms. Heim's conclusions that M.R. had academic deficits, that her focus improved with medication, that she had "slight" problems in interacting with and relating to others, and no issues regarding caring for herself.  (R. 54, 56-57.)  However, while the ALJ referenced those aspects of Ms. Heim's report in his opinion, at no point did he articulate what weight he afforded her report.  Additionally, the ALJ failed to explain why he evidently rejected aspects of Ms. Heim's report supporting M.R.'s claim.  Among other things, Ms. Heim wrote that M.R. had five "obvious problems" and three "serious problems" in Acquiring and Using Information, including serious problems with reading and comprehending written material, comprehending and doing math problems, and applying problem solving skills

in class discussions.  (R. 361.)  She also found that M.R. had five "obvious problems" and four "serious problems" in Attending and Completing Tasks, including serious problems on an hourly basis working at a regular pace and refocusing to a task, and serious problems on a daily basis with carrying out multiple step instructions, paying attention when spoken to directly, and working without being distracting.  (R. 362.)  She further concluded that M.R. had an "obvious problem" in Interacting and Relating With Others, specifically, making and keeping friends.  (R. 363.)  But the ALJ failed altogether to discuss this evidence suggesting disability.

The ALJ's failings with respect to Ms. Heim's report require remand.  In *Hopgood*, a case involving a child with ADHD, the Seventh Circuit concluded the ALJ's analysis was deficient because, among other things, he failed to explain why he did not credit teachers' reports finding that the child had serious or obvious problems in the domain of Acquiring and Using Information.  578 F.3d at 700; *accord Murphy*, 496 F.3d at 634-35 (reversing ALJ's decision where he "did not explain why he gave no weight to the portions of the school documents which support a finding that Nathan is disabled" and "did little to counter this evidence"); *Giles* 483 F .3d at 487-88 (reversing ALJ's decision where he noted, among other things, that the child's teachers reported numerous attention problems but did not explain why such evidence was insufficient to find a marked limitation in Attending and Completing tasks and noting "[w]e require an explanation of why strong evidence favorable to the plaintiff is overcome by the evidence on which an ALJ relies.").  The ALJ's failure to properly analyze Ms. Heim's report is particularly egregious given the extensive amount of time – 372 hours – that Ms. Heim spent with M.R. before submitting her report.  SSR 06-03p, 71 Fed. Reg. at

*45596 (ALJs "generally should explain the weight given to opinions from these 'other sources.'"); 20 C.F.R. § 416.927(c)(2)(i) (listing length and frequency of interaction as factor to be used in evaluating weight of opinion evidence).  As a result, this error also warrants remand.

###    D.    The ALJ Failed to Adequately Evaluate or Articulate his Assessment of Other Important Evidence.

In denying benefits, the ALJ must "sufficiently articulate his assessment … to assure us that [he] considered the important evidence." *Carlson*, 999 F.2d at 181. "Thus, although the ALJ need not discuss every piece of evidence in the record, [he] may not ignore an entire line of evidence that is contrary to the ruling.  Otherwise it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence." *Golembiewski*, 322 F.3d at 917 (citations omitted).  Further, "[w]e require an explanation of why strong evidence favorable to the plaintiff is overcome by the evidence on which an ALJ relies." *Giles*, 483 F.3d at 488.  Here, we find that the ALJ erred by failing to adequately address the following.

First, and as noted above, the ALJ's opinion appears to contain no discussion of evidence related to suicide.  It is perplexing that the ALJ did not explicitly address the incidents wherein M.R. expressly threatened and/or attempted suicide, given that the record contains repeated references to them.  (*E.g.*, R. 206, 368, 374, 408.)  Indeed, nearly every medical source commented on at least one such incident, and Drs. Cagas and Boyenga relied upon two of them to conclude M.R. had a marked limitation in the Caring for Yourself domain.  (R. 408.)  While the Commissioner relies on Dr. Hilger's report when arguing before this Court that M.R. "had not made any definite suicide

attempts," the ALJ did not discuss that aspect of Dr. Hilger's report. *Cf. Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (noting defense inappropriately relied on medical evidence that the ALJ did not cite in his decision). Moreover, the pertinent regulation does not make any such distinction regarding the relative import of suicide threats versus suicide attempts. *See* 20 C.F.R. § 416.926a(k)(3)(iv) ("Examples of limited functioning in caring for yourself" include "self-injurious behavior (e.g., suicidal *thoughts or actions*, self-inflicted *injury*, or refusal to take your medication), or ... ignor[ing] safety rules.") (emphasis added).[6] Because an ALJ cannot ignore an entire line of evidence when determining a claimant's level of functioning, remand is warranted for proper consideration of M.R.'s suicidal incidents. *E.g., Golembiewski*, 322 F.3d at 917 (ALJ improperly ignored evidence of claimant's bowel and bladder incontinence, despite the incontinence's allegedly infrequent occurrence).

Second, the ALJ failed to cite pertinent record support for his conclusion that any limitation in the Caring for Yourself domain "is associated with treatment compliance [sic]." (R. 56.) While Ms. Heim and Dr. Hilger both noted that M.R. was at times non-compliant with her medication, the ALJ did not reference that evidence in his analysis of this domain.[7] He also failed to reconcile his conclusion with evidence to the contrary,

---

[6] We acknowledge that, in discussing the Interacting and Relating with Others domain, the ALJ noted that "During the Spring of 2007, the claimant exhibited some worrisome morning behaviors, which prompted her grandmother to bring her to an ER." (R. 55.) But that passing reference, even assuming it corresponds to suicide-related evidence, does not qualify as an appropriate discussion, particularly as it was not made during the ALJ's discussion of the Caring for Yourself domain, where such evidence is most pertinent. 20 C.F.R. § 416.926a(k)(3)(iv).

[7] To the extent the ALJ considers the issue of treatment compliance on remand, we remind him of his obligation to consider any proffered reasons that might explain M.R.'s failure to take her prescribed medication. SSR 96-7p, 1996 WL 374186, at *7 ("the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek

25

including M.R.'s testimony – which the ALJ explicitly noted was credible – that her medications have not been fully effective in controlling her anger or fidgeting. (R. 54.) Indeed, his conclusion that treatment (non)compliance was responsible for any limitation in the Caring for Yourself domain seems to be at odds with his observation in the Attending and Completing Tasks domain that "even with compliance, full control over her inattention and inappropriate behavior has not been achieved." (R. 54.) Yet his decision articulates no grounds on which we might reconcile those statements.[8]

Relatedly, the ALJ cited no support for his conclusion that M.R.'s actions (or lack thereof) in caring for herself as reported by Ms. Robinson "reflect the disobedience of claimant, not her inability to perform these tasks." (R. 56.) That failure may indicate the ALJ inappropriately supplanted his opinion for that of a physician's, and/or misunderstood the nature of the mental illness at issue in this case. *Hopgood*, 578 F.3d at 702 (noting, in evaluating minor's disability claim based on ADHD, that "we are troubled by the ALJ's conclusion that LG's problems were a result of volitional choices.

---

or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner."); *Ellis v. Barnhart*, 384 F. Supp. 2d 1195, 1203 (N.D. Ill. 2005) ("[T]he ALJ could rely on [claimant's] non-compliance as long as he had first considered [claimant's] explanations for her non-compliance."). *See also Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010) ("The [ALJ]'s reference to Spiva's failing to take his medications ignores one of the most serious problems in the treatment of mental illness – the difficulty of keeping patients on their medications.").

[8] The ALJ's analysis of the Attending and Completing Tasks domain is similarly deficient. He relied primarily upon Ms. Robinson's and Ms. Heim's testimony, but failed to articulate how that evidence led to his conclusion that M.R.'s limitation was less than marked, rather than marked. *Cf. Giles*, 483 F.3d at 488 (ALJ noted evidence of attention problems but erred by not explaining why those findings were insufficient to find a marked limitation).

26

The ALJ did not point to any medical evidence supporting his finding that LG's difficulties were of his own doing, which flies in the face of our instruction that determinations must be based on testimony and medical evidence in the record.").

Finally, in the Acquiring and Using Information domain, the ALJ stated that despite her ADHD, M.R. "has never been referred for an assessment team evaluation, special class placement, or special services." (R. 54.) However, the ALJ failed to address contrary evidence from M.R.'s second grade teacher that M.R. was receiving extra help from the school social worker and the school psychologist, yet still remained a grade behind. (R. 174.) And as discussed above, while the ALJ discussed some evidence from Ms. Heim's report reflecting M.R.'s limitations in this domain, he failed to discuss all the contrary evidence in her report or the weight he afforded it. On remand, we respectfully direct the ALJ to appropriately address that evidence.

## V. CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment [26] is granted in part and denied in part. This case is remanded to the Social Security Administration for proceedings consistent with this opinion. It is so ordered.

ENTERED:

_____
MICHAEL T. MASON
United States Magistrate Judge

Dated: August 29, 2012